565 F.2d 1018
 Bedie THUNDERSHIELD, a/k/a Bede Thundershield, Petitioner,
v.
Herman SOLEM, Warden, South Dakota State Penitentiary, Sioux
Falls, South Dakota, and the State of South Dakota
and its officers and agents, Respondents.
 No. 77-1430.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 15, 1977.
Decided Nov. 14, 1977.
Rehearing Denied Dec. 13, 1977.
 
 William P. Fuller (made rebuttal), Woods, Fuller, Shultz & Smith, Sioux Falls, S. D., argued and filed brief and reply brief for petitioner.
 William J. Janklow, Atty. Gen., and Brent A. Wilbur, Asst. Atty. Gen. (argued), Pierre, S. D., on brief, for respondents.
 Before VAN OOSTERHOUT and MATTHES, Senior Circuit Judges, and STEPHENSON, Circuit Judge.
 STEPHENSON, Circuit Judge.
 
 
 1
 Petitioner Bedie Thundershield appeals from the dismissal of his application for a writ of habeas corpus by the district court.[1] In support of his claim that his plea of guilty to a state charge of second degree manslaughter was not entered knowingly, intelligently, and voluntarily, petitioner raises three separate yet overlapping issues for our consideration on appeal. We have examined each claim individually and collectively as part of the totality of the circumstances. We affirm the decision of the district court.
 
 
 2
 On July 4, 1971, the body of Paul Raymond Gilchrist was found floating in a rural South Dakota lake. After receiving a statement from petitioner's wife, two Bureau of Indian Affairs (BIA) policemen questioned petitioner concerning the death of Mr. Gilchrist at Fort Yates, North Dakota, on July 19. Under questioning at Fort Yates, where petitioner was imprisoned for violation of a tribal ordinance, petitioner stated that he and his wife had been drinking at the lake with Mr. Gilchrist, after which he passed out only to be awakened by his wife's screams. Petitioner stated that Gilchrist had ripped off his wife's panties and was in the process of having sexual intercourse with her when he awoke. Petitioner stated that he then struck and kicked Mr. Gilchrist in the face, and that he had been pretty drunk and didn't know but he may have hit Gilchrist with a tire iron or other weapon. In addition, petitioner admitted that he might have thrown the body of Gilchrist into the lake.
 
 
 3
 After his conversation with the two officers, petitioner was returned to South Dakota. Petitioner was originally charged with the offense of murder. However, following a preliminary hearing on July 31, 1970, a plea bargain was arranged. It was agreed that Thundershield would be allowed to enter a plea of guilty to the crime of second degree manslaughter, which carried a maximum sentence of ten years, rather than face trial for murder, which carried a possible sentence of death. In accordance with the plea bargain, the murder charge was ultimately dismissed after petitioner entered a plea of guilty to manslaughter in the second degree on September 15, 1971.
 
 
 4
 Subsequently, petitioner corresponded with the judge who had received the plea and advised him that he had not committed the crime charged. Court was reconvened on November 2, 1971, at which time the court acknowledged receipt of the letters and informed the petitioner that he could withdraw his plea. Petitioner declined and upon reaffirmance of his desire to plead guilty to second degree manslaughter the court sentenced him to a term of nine years and nine months in the South Dakota penitentiary.
 
 
 5
 In August of 1972 petitioner applied for state post-conviction relief on the basis that his plea of guilty was not voluntarily, knowingly, and understandably made. After a hearing, which was held on July 10, 1973, the application was denied. The South Dakota Supreme Court affirmed the decision of the state trial court in State v. Thundershield, 242 N.W.2d 159 (S.D.1976).
 
 
 6
 On July 14, 1976, the petitioner filed his application for a writ of habeas corpus in federal district court. Petitioner's original appointed counsel had moved to California and was beyond the subpoena power of the district court. Therefore evidence was received through affidavits, written interrogatories, and petitioner's deposition taken in advance of the state post-conviction hearing. Petitioner was present but indicated he was content to rest his case-in-chief on his deposition. He testified very briefly in rebuttal. The denial of the application by the district court led to the filing of this appeal.
 
 
 7
 Before this court, petitioner is asserting that his plea was not entered knowingly, intelligently and voluntarily. A plea of guilty, which waives the constitutional rights of trial by jury, confrontation of one's accusers, and the privilege against compulsory self-incrimination, is constitutionally valid only if it represents a voluntary and intelligent choice among the alternate courses of action open to the defendant.[2] North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed. 162 (1971); Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). Petitioner's first argument is that the plea of guilty was defective in that he refused to admit commission of the crime.
 
 
 8
 At the proceedings on September 15, 1971, where the petitioner's plea of guilty was first received, petitioner stated that he was satisfied that Gilchrist was dead. However, he did not specifically admit that he had killed Gilchrist, although he did indicate that "maybe" he had killed him.[3] During the interim between the acceptance of the plea and sentencing, the court received two letters from the petitioner which recounted his version of the incident and in effect denied commission of the crime.[4]
 
 
 9
 When court was reconvened on November 2, 1971, the court informed petitioner that he could withdraw his plea at that time. The petitioner declined and the court was instead presented with an attorney-prepared statement signed by petitioner which was read into the record.[5] The statement, among other things, related that petitioner did not wish to withdraw his plea of guilty; no promises or threats were made against him to plead to the charge; and that the petitioner was satisfied with his attorneys. Prior to its presentation in court, at the petitioner's request the following sentence was stricken and the change initialed: "I understand that by pleading guilty to the charge, I am admitting that I killed Paul Raymond Gilchrist." Despite the petitioner's refusal to admit committing the crime, the plea was accepted.
 
 
 10
 The district court found that this issue concerning whether petitioner's refusal to admit guilt rendered his guilty plea involuntary and invalid was controlled by the case of North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). In Alford, the defendant was charged with murder and faced the prospect of the death penalty if that prosecution proved to be successful. Alford steadfastly insisted that he had not committed the crime, but nonetheless entered a plea of guilty to second degree murder in order to negate the threat of the death penalty. The Supreme Court in Alford held that when a person pleads guilty to a crime while protesting his innocence, the plea is not thereby rendered constitutionally invalid. The court stated:
 
 
 11
 Thus, while most pleas of guilty consist of both a waiver of trial and an express admission of guilt, the latter element is not a constitutional requisite to the imposition of criminal penalty. An individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime.
 
 
 12
 North Carolina v. Alford, supra, 400 U.S. at 37, 91 S.Ct. at 167.
 
 
 13
 Petitioner strongly urges that Alford is only applicable where evidence is presented which provides a strong factual basis for the plea. In support of this contention petitioner relies on a statement by Justice White for the majority in Alford that:
 
 
 14
 In view of the strong factual basis for the plea demonstrated by the State and Alford's clearly expressed desire to enter it despite his professed belief in his innocence, we hold that the trial judge did not commit constitutional error in accepting it.
 
 
 15
 North Carolina v. Alford, supra, 400 U.S. at 38, 91 S.Ct. at 168.
 
 
 16
 In response to this contention the district court held:
 
 
 17
 I am not willing to accept this limitation, as I believe the relevant inquiry dictated by Alford is not as to the relative strength of the state's case, but as to the motives the defendant has for entering the plea, and the nature of that plea as voluntarily and intelligently made. Here, the motive for the plea was clearly to avoid the possibility of a sentence of death or life imprisonment.
 
 
 18
 Thundershield v. Solem, supra, 429 F.Supp. at 953.
 
 
 19
 Assuming arguendo that petitioner has correctly interpreted the rationale of Alford, we nevertheless hold that it was not error for the trial court to accept petitioner's plea of guilty. It was proper for the state trial court to consider testimony concerning the petitioner's statement to the BIA officers contained in the transcript of the preliminary hearing on file with the court as part of the factual basis for the plea even though under current legal standards the statement might not be admissible at trial. Cf. Irizarry v. United States, 508 F.2d 960, 967 (2d Cir. 1974); United States v. Bethany, 489 F.2d 91 (5th Cir. 1974). At the time the plea was accepted petitioner had not moved to suppress the statement and thus it was not incumbent upon the prosecution to produce more evidence of guilt or show that the statement was properly procured. The plea of guilty operated to relieve the prosecution of its burden of proving each element of the charge beyond a reasonable doubt at trial. See Boykin v. Alabama, 395 U.S. 238, 242 n. 4, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). When this statement is considered along with all the other evidence available in the case at the time the plea was accepted, we are satisfied that there was a sufficiently strong factual basis to justify the taking of petitioner's plea of guilty notwithstanding his refusal to unequivocally admit killing Mr. Gilchrist.
 
 
 20
 Petitioner's own statement to the BIA officers showed that he was involved in an altercation with the deceased at the place where the body of the deceased was found. He admitted that he had kicked Gilchrist in the face and may have hit him with a tire iron and thrown his body into the lake but he was too drunk to remember. A pathologist's report showed that Gilchrist died from a blow to the head. Petitioner's account of seeing Gilchrist in the process of raping his wife would have been of dubious credibility when it is taken into account that Gilchrist was found in the lake with his belt buckled and his pants zipped. It is also noted that the deceased victim had an artificial arm. Furthermore, if petitioner had chosen to take the stand he may have been impeached by evidence showing that he had presented a nearly identical defense on a previous occasion when he and his wife were tried and found guilty by a jury of assault with a dangerous weapon and first degree robbery. See State v. Thundershield, 83 S.D. 414, 160 N.W.2d 408, 410 (1968). In addition, petitioner had a very extensive criminal record including convictions for rape, burglary, assault with a deadly weapon, and grand larceny.
 
 
 21
 The petitioner's plea of guilty which was supported by independent corroborative evidence of guilt is not invalidated merely because he concomitantly accepted criminal responsibility but denied commission of the crime. Compare United States ex rel. Dunn v. Casscles, 494 F.2d 397 (2d Cir. 1974). Here, Thundershield made the deliberate and measured choice to plead guilty to second degree manslaughter because the most he could receive was ten years and in the event he was convicted of first degree murder the death sentence or life imprisonment could have been imposed.[6] Therefore, he could have intelligently concluded at the time he pled guilty that it was in his own best interest to plead guilty to second degree manslaughter, thereby avoiding the possibility of receiving a sentence of death or life imprisonment. Thus, he cannot now challenge the validity of his knowing and voluntary plea because he has doubts about the wisdom of that choice. See Brady v. United States, 397 U.S. 742, 755-57, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); Coleman v. Burnett, 155 U.S.App.D.C. 302, 307, 477 F.2d 1187, 1193-96 (1973); State of Missouri v. Turley, 443 F.2d 1313, 1317 (8th Cir.), cert. denied, 404 U.S. 965, 92 S.Ct. 336, 30 L.Ed.2d 284 (1971).
 
 
 22
 Petitioner's related second point is that the plea was not voluntary because it was coerced by the existence of petitioner's statement to the BIA officers, which was obtained in violation of constitutional principles. The district court found "that the record, as supplemented, fails to show the waiver of the right to consult with an attorney under the appropriate federal standards," Thundershield v. Solem, 429 F.Supp. 944, 951 (D.S.D.1977). However, the evidence was in conflict on this issue. See note 7, infra.
 
 
 23
 In McMann v. Richardson, 397 U.S. 759, 772, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970), the United States Supreme Court held that "a plea of guilty in a state court is not subject to collateral attack in a federal court on the ground that it was motivated by a coerced confession unless the defendant was incompetently advised by his attorney." The only distinction between the present case and McMann is that here the petitioner did not unequivocally admit committing the crime. North Carolina v. Alford, supra, settles any doubt as to whether the lack of such admission should be determinative in assessing whether a guilty plea is voluntarily, knowingly, and intelligently made.
 
 
 24
 Many considerations may influence an accused to plead guilty. See McMann v. Richardson, supra, 397 U.S. at 766-68, 90 S.Ct. 1441; McCoy v. United States, 124 U.S.App.D.C. 177, 179, 363 F.2d 306, 308 (1966). However, petitioner's deliberate choice to waive trial cannot easily be eradicated years after the event. Langdeau v. United States, 446 F.2d 507, 509 (8th Cir. 1971). See also McMann v. Richardson, supra, 397 U.S. at 774, 90 S.Ct. 1441. Whether the petitioner believed that his statement was suppressible or not this case is controlled by McMann. If it is argued that petitioner was erroneously told that his statement would be admissible then the facts here fall directly within the explicit holding of McMann that a guilty plea is valid despite such an erroneous assessment unless there is ineffective assistance of counsel. If, on the other hand, it is argued that petitioner was told that the statement could be suppressed and nevertheless he pleaded guilty "the plea can hardly be blamed on the confession which in his view was inadmissible evidence and no proper part of the State's case." McMann v. Richardson, supra, 397 U.S. at 768, 90 S.Ct. at 1447. It is impossible to ascertain at this time what other evidence was available to the prosecution or the petitioner was aware might be discovered through further investigation in 1971 and which motivated the petitioner to enter his plea of guilty.
 
 
 25
 Thus, we are left with the task of examining the record to determine if petitioner received effective assistance of counsel in the state court proceedings. The record from the proceedings in the South Dakota state courts shows that there was considerable controversy as to whether or not petitioner effectively waived his right to the presence of an attorney before making his statement to the BIA officers in North Dakota. The transcript from the preliminary hearing shows that petitioner's attorneys were aware of possible grounds for suppression, and attempted by extensive cross-examination of the two officers to create a record which could serve as a basis for a later suppression motion in the state circuit court. However, the facts were such that counsel could not be expected to automatically conclude that petitioner's statements were clearly suppressible.[7]
 
 
 26
 As the Supreme Court stated in McMann v. Richardson, supra, 397 U.S. at 769-70, 90 S.Ct. at 1448, "the decision to plead guilty before the evidence is in frequently involves the making of difficult judgments. * * * In the face of unavoidable uncertainty, the defendant and his counsel must make their best judgment as to the weight of the State's case. * * * Waiving trial entails the inherent risk that the good-faith evaluations of a reasonably competent attorney will turn out to be mistaken either as to the facts or as to what a court's judgment might be on given facts." From the rule that a plea must be intelligently made to be valid it does not follow that a plea is vulnerable to later attacks solely because the petitioner or his counsel did not correctly assess every relevant factor which contributed to his decision.
 
 
 27
 One of petitioner's attorneys did testify at the state post-conviction relief hearing that he told the petitioner that he was of the opinion that the petitioner's statement to the BIA officers could probably be suppressed. He also stated that he informed Mr. Thundershield that he believed that even if he were successful in keeping the confession out of the prosecution's case-in-chief it could probably be used for impeachment purposes if the petitioner took the stand. The correctness of this latter assessment was borne out by the subsequent Supreme Court case of Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).
 
 
 28
 Once petitioner entered his plea of guilty to the offense charged he was not thereafter free to raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the range of competence demanded of attorneys in criminal cases. Tollett v. Henderson, 411 U.S. 258, 267, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973); McMann v. Richardson, supra, 397 U.S. at 771, 90 S.Ct. 1441. The district court noted that no claim of ineffective assistance of counsel either had been or could be successfully raised by petitioner. Thundershield v. Solem, 429 F.Supp. 944, 954, 958 (D.S.D.1977). This finding is adequately supported by the record before us.
 
 
 29
 Petitioner's final claim is that his plea was unintelligent because he was not properly advised of the elements of the crime with which he was charged. In South Dakota manslaughter in the second degree is statutorily defined as follows:
 
 
 30
 22-16-20. Manslaughter in second degree All killings not otherwise provided for. Every killing of one human being by the act, procurement, or culpable negligence of another which, under the provisions of this chapter, is not murder nor manslaughter in the first degree, nor excusable nor justifiable homicide, is manslaughter in the second degree.
 
 
 31
 S.D. Compiled Laws Ann. s22-16-20.
 
 
 32
 The state trial court explained the elements of second degree manslaughter to petitioner two separate times. After the first explanation, petitioner indicated that he did not understand; the elements were then re-explained to him, but the judge inadvertently omitted reference to the possible defense of justifiable homicide.[8] It is petitioner's contention that his statement to the BIA officers constituted nothing more than a rendition of justifiable homicide, see S.D. Compiled Laws Ann. § 22-16-35, and thus it was reversible error to not adequately explain this possible defense to petitioner.
 
 
 33
 The recent Supreme Court case of Henderson v. Morgan, 426 U.S. 637, 96 S.Ct. 2253, 49 L.Ed.2d 108 (1976), establishes the guidelines which must be followed by this court in assessing the merits of petitioner's claim of error on this point. In Henderson, the defendant contended that his guilty plea to second degree murder was involuntary for the reason that he was not aware that an attempt to cause death was an element of the offense. The Supreme Court held that the plea was not voluntary in the sense that it could not be an intelligent admission because there was no showing that he received notice of the true nature of the offense.
 
 
 34
 There is a significant difference, however, between Henderson v. Morgan, supra, and the present case. In Henderson, it was crucial to the decision of the Supreme Court that the lower court had made the specific finding that the defendant "was not advised by counsel or court, at any time, that an intent to cause the death or a design to effect the death of the victim was an essential element of Murder 2nd degree." Henderson v. Morgan, supra, 426 U.S. at 640, 96 S.Ct. at 2255. The majority opinion in Henderson stated:
 
 
 35
 Normally the record contains either an explanation of the charge by the trial judge, or at least a representation by defense counsel that the nature of the offense has been explained to the accused. Moreover, even without such an express representation, it may be appropriate to presume that in most cases defense counsel routinely explain the nature of the offense in sufficient detail to give the accused notice of what he is being asked to admit. This case is unique because the trial judge found as a fact that the element of intent was not explained to respondent.
 
 
 36
 Henderson v. Morgan, supra, 426 U.S. at 647, 96 S.Ct. at 2258.
 
 
 37
 In the present case, on the contrary, the district court made the specific finding of fact that petitioner had been informed of his possible defenses by counsel. Thundershield v. Solem, supra, 429 F.Supp. at 957. The record is replete with statements by defense counsel that he had explained the elements of the charge and possible defenses including justifiable and excusable homicide to the petitioner and that he understood. Compare Rinehart v. Brewer, 561 F.2d 126 (8th Cir. August 19, 1977). In addition, the sentencing judge offered to let the petitioner withdraw his plea after he received the letters from the petitioner claiming that he had not killed Gilchrist. After conferring with his attorney, petitioner declined to withdraw his plea.[9] Under Henderson, this is sufficient to insure that the plea was an intelligent admission.
 
 
 38
 We are satisfied from a review of the entire record that Thundershield understood the alternatives open to him and chose to plead guilty to the charge of second degree manslaughter to avoid the perils of a murder trial which could result in his being sentenced to death or life imprisonment. Accordingly, we affirm the dismissal of petitioner's application for a writ of habeas corpus by the district court.
 
 
 39
 Affirmed.
 
 
 
 [1]
 The Honorable Fred J. Nichol, Chief Judge, United States District Court for the District of South Dakota. The decision is reported at 429 F.Supp. 944
 
 
 [2]
 It is central to all of petitioner's arguments that he claims that he had, and continues to have, a very limited understanding of the English language and requires the services of a Lacotah interpreter. The only evidence supporting petitioner's claim that he could not comprehend the advice his attorney gave are his own self-serving statements. This claim has been considered by each of the lower courts and has been unanimously rejected. See Thundershield v. Solem, 429 F.Supp. 944, 957 (D.S.D.1977); State v. Thundershield, 242 N.W.2d 159, 162-63 (S.D.1976). We see no reason on the record before us to disturb the judgment of those courts. See State of Missouri v. Turley, 443 F.2d 1313, 1316 (8th Cir.), cert. denied, 404 U.S. 965, 92 S.Ct. 336, 30 L.Ed.2d 284 (1971)
 Petitioner's original attorney has indicated that at the time of arraignment, plea, and sentencing there were some difficulties in communication, but he was satisfied that Thundershield understood the matters explained to him. Thundershield v. Solem, supra, 429 F.Supp. at 957. The strongest evidence that petitioner has a greater understanding of the English language than he claims is provided by the statement prepared by his attorney for presentation to the judge at the sentencing proceeding. See note 5, infra. Petitioner's counsel testified that petitioner read the statement and he demanded one sentence be stricken. He then initialed the change and signed the statement.
 
 
 [3]
 The following exchange took place between the petitioner and the court:
 BY THE COURT: Is the defendant satisfied that Paul Raymond Gilchrist is now dead?
 BY THE DEFENDANT: Yes.
 BY THE COURT: Are you satisfied that he died by an act of yourself?
 BY THE DEFENDANT: (No response)
 BY THE COURT: Are you satisfied he died as a result of some act you did?
 BY THE STATES ATTORNEY: Your Honor, for point of clarification I might point out that Mr. Thundershield's confession to I think Calvin Yellowrobe and Henry Gayton, he said that he did kick him and that he may have hit him with a tire iron. In other words by his acts, this is what the Judge is wondering. Whether you by your acts, your kicking, hitting him with the tire iron caused his death.
 BY THE DEFENDANT: I didn't use any tire iron.
 BY THE COURT: But some act, in other words, that at this time the Court must determine that there is a factual basis for this charge, and that factual basis would be that Paul Gilchrist is dead and he is dead as a result of some act you did. Now are you satisfied that he is dead and that he is dead as a result of some act you did, whatever that act was?
 BY MR. BROWN: My client doesn't understand Your Honor. Perhaps the use of the word "act" confuses him.
 BY THE COURT: Well did you either hit or kick or strike, or something to that nature, Mr. Gilchrist?
 BY THE DEFENDANT: Kicked, that's all.
 BY THE COURT: And did that act facilitate, or did that act result in his death?
 BY THE DEFENDANT: (No response)
 BY THE COURT: Did that cause him to be killed?
 BY THE DEFENDANT: I don't know.
 BY THE COURT: You don't know?
 BY THE DEFENDANT: Yes.
 BY THE COURT: But at least you are satisfied that he may have died because you kicked him?
 BY THE DEFENDANT: Maybe.
 
 
 [4]
 One of these letters provided in pertinent part:
 
 
 [5]
 The statement read as follows:
 The court asked the petitioner if that was his signature at the bottom of the statement and if he still agreed with everything it said and he replied in the affirmative.
 
 
 [6]
 The following exchange took place between the petitioner and the sentencing court:
 BY THE COURT: Is there any reason why you want to have your plea of guilty entered even though you deny or do not admit that you killed him?
 BY THE DEFENDANT: Well anyway I will plead guilty to that. Well I really don't know that, we were all drunk then.
 BY THE COURT: Why do you plead guilty then?
 (No response)
 BY THE COURT: Do you realize that you could have a jury trial?
 (No response)
 BY THE COURT: Do you realize that you could have a jury trial?
 BY THE DEFENDANT: No.
 BY THE COURT: In other words, if you were to plead not guilty you would be entitled to a jury trial, do you realize that?
 BY THE DEFENDANT: Yes.
 (Reporter's note: Mr. Thurow at this time had a discussion with his client at the counsel table which went as follows:
 BY THE DEFENDANT: Well I don't know, I will just let it stand.
 BY MR. THUROW: Yes, but you have to tell him the reason why you want it to stand. He won't let it stand until you tell him the reason, what the reason is; that the reason is because it is a maximum of 10 years and the other one is a much bigger sentence that you are afraid you might be convicted of. Just tell him that.
 BY THE DEFENDANT: Why don't you tell him for me?
 BY MR. THUROW: I want it in the record that they are your words.
 BY THE COURT: In view of the difficulty the defendant has expressing himself, since you as his attorney have visited with him, why don't you express or explain to the Court his reasons and I can ask him if those are his reasons.
 BY MR. THUROW: Your Honor, the best I understand it, the reason Mr. Thundershield wants to plead guilty to the lesser included crime, even though he says in his letter and says in court today that he did not kill him, Mr. Gilchrist, is that Mr. Thundershield knows that by pleading guilty here the most he can get for a sentence is 10 years in the penitentiary. The crime that the State would charge him in a jury trial with is first degree murder which could be a life sentence or he could be committed to the electric chair, and he is afraid that if he is tried that there is a reasonable possibility that he would be convicted of first degree murder, and he therefore feels he is better off pleading guilty to second degree manslaughter, which has the maximum of 10 years, than he is at standing a trial for first degree murder, which has the much more severe sentence, and I believe that's what Mr. Thundershield's reason is for insisting that he does not want to withdraw his plea. I request the Court to ask Mr. Thundershield if this is the reason?
 BY THE COURT: Did you hear what your counsel had explained as your reason?
 BY THE DEFENDANT: Yes.
 BY THE COURT: And is that your reason for entering a plea of guilty to this information?
 BY THE DEFENDANT: Yes.
 BY THE COURT: The plea of guilty will be allowed to stand.
 
 
 [7]
 During the course of the cross-examination at the preliminary hearing the two BIA officers presented conflicting testimony. Officer Gayton, who did not administer any of the Miranda warnings, recalled that petitioner had requested an attorney and was advised he could have one, "but he still talked to us voluntarily." Officer Yellow Robe, who was the person who administered the Miranda warnings to petitioner, testified that petitioner told them that he would provide information to them right then in North Dakota without the presence of an attorney, but wanted an attorney upon arrival in South Dakota so that he could give a statement to officials. Officer Yellow Robe also testified that petitioner had orally waived his Miranda rights to the two officers
 
 
 [8]
 The following discussion occurred between the court and petitioner:
 (BY THE COURT:) The elements of this offense, that which the state would have to prove, are alleged in the information. That you, by your own act, procurement or culpable negligence, in other words one of these three ways, you killed another human being, that human being, being Paul Raymond Gilchrist. In other words by your act you killed somebody, or by your procurement you killed somebody, or by culpable negligence you killed somebody. Whichever of those three would apply, and of course such killing would not be justifiable. In other words, you had no authority of law, no other legal reason to kill him, and of course it's not such as would be first degree, just plain murder, which I have previously explained, or it wouldn't be first degree manslaughter. Now that's quite lengthy, do you have any questions concerning what the elements of this offense are?
 BY THE DEFENDANT: (No response)
 BY THE COURT: Do you have any questions?
 BY THE DEFENDANT: No, I don't understand.
 BY THE COURT: Do you have any questions to ask the Court, to ask me, to help you further understand this provision?
 BY THE DEFENDANT: No.
 BY THE COURT: Do you understand it?
 BY MR. BROWN: My client indicates that he does not understand Your Honor.
 BY THE COURT: Okay. What is the extent of your education?
 BY THE DEFENDANT: Fourth grade.
 BY THE COURT: Okay, the offense charged is second degree manslaughter, that's its common name, that's what we refer to it as commonly, and to have committed that crime you must have done certain things which the State must prove and that is, that you killed Paul Raymond Gilchrist by your own act. That would be one way of proving it. Now there is other words the statute uses, or by your procurement. You didn't directly, but some way indirectly; or culpable negligence. I doubt if that is what the State is after, but it could be; but any one of those three, by your act, by your procurement, or by your culpable negligence you killed Paul Raymond Gilchrist. That is what the State would have to prove. Now do you understand that?
 BY THE DEFENDANT: Yes.
 
 
 [9]
 We are not unmindful that the petitioner was no stranger to criminal proceedings and had offered an almost identical defense in an earlier case. See State v. Thundershield, 83 S.D. 414, 160 N.W.2d 408, 410 (1968). This fact seriously undercuts the credibility of petitioner's claim of lack of knowledge of the defense of justifiable homicide in the instant case